# CHARLESTON.

## BOWEN v. CITY OF HUNTINGTON.

Submitted June 17, 1891.—Decided December 7, 1891.

1. DAMAGES—MUNICIPAL CORPORATION—NEGLIGENCE.

Where an injury has been sustained by a person on a sidewalk in an incorporated city or town, by reason of excavations made by an abutting lot-owner in order to lay down a pavement in conformity with the grade established by said town or city under its directions, although, during the progress of said improvement, the absolute liability imposed by section 53 of chapter 43 of the Code may be suspended, yet, in order to escape liability for an injury received by a party walking along said sidewalk in the night-time, without notice of such excavation, said work of improvement must not be conducted negligently by said lot owner while the work is progressing. Neither must said excavation, when the work is completed, be left in such a condition as to cause injury to pedestrians passing along said pavement in the night-time without notice of its condition.

2. EVIDENCE—EXPERTS.

When a medical witness is introduced and examined as an expert it is proper to propound to him a hypothetical question, reciting certain facts which the evidence in the cause tends to prove, and such recital need not contain all of the facts which the evidence has a tendency to prove, but counsel may embody in the question such facts as tend to support his theory of the case in order to elicit the opinion of the witness based upon the testimony of other witnesses in the cause, or upon scientific principles applied to the facts so testified to.

3. EVIDENCE—EXPERT.

Upon a trial in which such expert testimony is competent and proper, the physician or the expert may give his opinion on any hypothetical state of facts which the evidence tends to prove, but his opinion must be based upon the state of facts as testified to by himself or other witnesses, but not upon his knowledge of other facts not testified to by himself or others. In such case, the questions put and the answers given should be so put and so given as not to elicit or cause the expression of an opinion by the physician or other expert on the credit of the witnesses, or the truth of the facts testified to.

4. EVIDENCE—EXPERT.

Where the conclusions called for by a hypothetical question

from a medical man, who is being examined as an expert, depend upon facts, the evidential weight of which can only be determined by those familiar with that specialty, then those conclusions may be given by an expert in such specialty.

5. Damages—Municipal Corporations.

Where a party suffering with *paraphlegia* or paralysis of the lower half of his body institutes a suit for damages against an incorporated city or town, claiming that his condition was caused by stepping over an offset in the pavement in the night-time, occasioned by lowering the grade of the pavement at that point, which was left in that condition by the negligence of the party who laid down the pavement under the orders of said city or town, and the defendant, by way of defence, attempts to show that the condition of the plaintiff resulted from a disease of long standing, it is competent for a medical witness, in response to an hypothetical question, to state his conclusions as to the proximate cause of the paralysis.

*Campbell & Holt* for plaintiff in error, cited 8 S. E. Rep. 493 ; 17 W. Va. 683.

*Gibson & Michie* for defendant in error, cited 2 Shear. & Redf. Neg. (4th Ed.) § 742 ; 38 Wis. 584 ; 2 Dill. Mun. Corp. (4th Ed.) § 1047 *et seq.*

English, Judge :

This was an action of trespass on the case brought by Dyke Bowen against the city of Huntington, in the Circuit Court of Cabell county, for the recovery of damages for injuries alleged to have been sustained by the plaintiff in consequence of an excavation in one of the defendant's sidewalks, which caused a steep and perpendicular descent and fall of nearly two feet in depth in said sidewalk, within the corporate limits of the defendant. The defendant demurred to the declaration, which demurrer the court overruled, and the defendant pleaded not guilty. The issue was submitted to a jury, who returned a verdict in favor of the plaintiff for one thousand seven hundred and fifty dollars, and thereupon the plaintiff moved the court to set aside the verdict of the jury, on the ground that the same was contrary to the law and the evidence, which motion was subsequently withdrawn, and thereupon the defendant moved the court to set aside the verdict rendered therein as aforesaid, on the ground that the same was contrary to the law and the

evidence, which motion was overruled by the court, and judgment was rendered upon said verdict for the sum of one thousand seven hundred and fifty dollars, and costs, and from this judgment the defendant obtained this writ of error.

The facts disclosed by the evidence are in substance as follows: In the fall of 1888, L. D. Sanborn, who resided in the city of Huntington, on the corner of Third avenue and Twelfth street, was ordered by the city authorities to pave the sidewalk in front of his lot on Third avenue with brick or stone, the space intended for the sidewalk being fifteen feet wide. About four years previously the board walk had been taken up and a brick and stone walk had been put down about four or five feet wide, level with the ground, on either side thereof, and in 1888 the city determined to have the entire space of fifteen feet left for a sidewalk paved with brick or stone, and in obedience to said orders the said Sandborn had to cut down about fourteen inches to get the grade established by the city. On the inside next to his lot it was sixteen inches down to the grade, the ground being a little higher at that point, while next to the gutter it was ten inches. After making the excavation he put in two inches of sand, and then laid the brick on top of the sand, reducing the depth of the excavation to twelve inches next to the lot and six inches next to the gutter. Mr. Emmons, who owned the lot adjoining on the east, did not put his pavement down at the same time, which caused an offset next to the Emmons lot of twelve inches next to the lot and six inches next to the gutter. After Mr. Sanborn finished his pavement he kept a light and guard at this offset for two or three days. He then made a step out of two-inch oak plank, fifteen inches wide and six or seven feet long, about equally dividing the ten inches left from his brick pavement to the top of the flag-stone in front of the Emmons lot, which step remained there for three or four days, till the flag-stone on the Emmons lot was sloped down. W. O. James came up there and said the city had ordered him to slant down the walk, and he slanted it down, and took the step away. The flag-stone was five or five and a half feet long, and said San-

born assisted said James in sloping down the walk. He took up two flag-stones, and dug the dirt from under them and again let the stones down. The dirt was flush with the flag-stones. The whole width of the fifteen feet was open to travel, and nothing was done to the sidewalk outside of the flag-stones. The sidewalk east of Sanborn's on Third avenue was composed of flag-stones about four feet wide, although the whole space of fifteen feet was open to travel. Supposing the pavement constructed of flag-stones to have been five feet in width, and placed in the center of the space allowed for the sidewalk, this would leave about five feet on each side of said stone pavement which remained unpaved, and foot passengers had the right to travel over any portion of the fifteen feet of space allowed for said sidewalk. According to the evidence of Sanborn, said offset was only sloped down the width of the stone pavement, and nothing was done to slope the same between the stone pavement and his lot; and William Sanborn states that the balance of the fifteen-foot space was left just as it was before, that there were no barriers, but that a light was kept there until the walk was sloped down by W. O. James; that there was no light there on the 18th of November, 1888, and there was an offset on each side of the flag-stone.

Looking, then, at the circumstances surrounding the accident which, the plaintiff claims, occasioned the injury complained of, we find that the night was a dark one. No barrier or beacon light had been provided by the town to warn plaintiff of the excavation, and the entire space of fifteen feet was open to travel, and constantly used. The evidence does not show that the plaintiff was acquainted with the fact that the offset existed, or that the excavation had been made, but, on the contrary, he states in his testimony that he had often been along there before. There was no notice to him of this offset, and he did not know they were grading, and the defendant failed to bring home to him any notice of the existence of this offset in the pavement. Under these circumstances, then, if the injuries complained of by the plaintiff resulted from the sudden wrench received in stepping over said offset in the pavement, we can see no

valid excuse, in the light of the rulings of this Court, in reference to injuries received on sidewalks and streets, for the negligence of the defendant in leaving the pavement at that point in the condition it was at the time of the accident.

It is true that the act of the corporation in sloping the pavement the width of the flag-stones was a step in the proper direction, and no doubt would have answered all purposes for pedestrains passing in daylight; but pavements must be so constructed and kept as to be safe at all times, day or night.

The question, however, which assumed the most prominence and evoked the most controversy upon the trial of the case was whether the *paraphlegia* from which the plaintiff was shown to be suffering was the result of the accident occasioned by the defect in the sidewalk, or was a consequence induced by the disease from which he was and had been suffering. In order to allow the jury to have a fair opportunity of determining properly to which of these causes his condition was referable, it became necessary to introduce medical men, and examine them as experts. The plaintiff was suffering from paralysis of the lower limbs, which, the defence contended, was the result of syphilis in its tertiary form, and the plaintiff attributed it to the injury received by reason of the defect in the pavement. Several respectable physicians proved that they had treated the plaintiff for syphilis, and he had improved temporarily under their treatment, and it also clearly appeared that he stepped over the offset in the pavement.

The first error assigned by the plaintiff in error is that the hypothetical question propounded by the plaintiff to Dr. D. W. Dabney, which was objected to by the plaintiff in error, did not correctly detail the evidence either as to the accident or the disease. Said question is set forth in bill of exceptions No. 1, and reads as follows:

"Now, doctor, suppose Dyke Bowen to have been a sound and healthy man up to the 18th of November, 1888, and was walking along the sidewalk in the city of Huntington, in the night-time, and in the dark suddenly and unexpectedly stepped over a declivity or offset from ten to fourteen

inches in height, and walked some fifty yards, and felt a sickness, walked some five squares to his brother-in-law's house; then, complaining of his back, went to bed, had a violent chill, got up the next morning, and in undertaking to put on his pants fell back on the bed, found a difficulty in using his legs; got up and got his breakfast, then some stimulants; walked some three or four miles to where his team was working; found a difficulty in using his left leg, toe catching; got down to where the team was; was unable to walk up the hill, and used the tail of an ox to assist him; found a difficulty of locomotion, and after staying there two and a half days was unable to do much, went home, laid up awhile; got out in a week or two and tried to do work for himself again, but found himself unable to use his limbs; went home, and from that day to this has been growing worse, losing locomotion in one limb and sensation in the other—taking all these things to be true, what would you say is the proximate cause of this effect?"

Said question was also objected to because it did not contain a full and correct recital of the evidence, and on the further ground that it recites facts which were not in evidence; which objection was overruled, and said Dr. Dabney answered as follows: "Taking that as a basis, it would be highly probable the fall had something to do with it."

The authorities, so far as we have been able to examine them, appear to hold that it is not necessary, in submitting an hypothetical question to an expert, to state the facts as they exist, but that counsel may assume the facts in accordance with his theory of them.

In the case of *Cowley* v. *People*, 83 N. Y. 464, FOLGER, C. J., in delivering the opinion of the Court, said: "The claim is that an hypothetical question may not be put to an expert unless it states the facts as they exist. It is manifest, if this is the rule, that in a trial where there is a dispute as to the facts, which can only be settled by the jury, there would be no room for an hypothetical question. The very meaning of the word is that it supposes or assumes something for the time being. Each side in an issue of fact has its theory of what is the true state of facts, and

assumes that it can prove it to be so to the satisfaction of the jury, and, so assuming, shapes hypothetical questions to experts accordingly; and such is the correct practice." As to a matter of course it would be improper to propound an hypothetical question which would be foreign to the issue and irrelevant to the testimony.

Wharton, in his work on Criminal Evidence (§ 418) says : " When insanity is set up by defendant, and denied by the prosecution, an expert can not be asked his opinion as to the evidence in the case as rendered, not only because this puts the expert in the place of the jury in determining as to the credibility of the facts in evidence, but because the assistance thus afforded is, in most trials, illusory, experts being usually in conflict, and the duty devolving on court and jury of supervising the reasoning of experts being one which can be rarely escaped. It has been said, however, that when the facts are undisputed, the opinion of an expert can be asked as to the conclusions to be drawn from them and as to the conclusions to be drawn from the testimony of a particular witness ; and it is settled that experts of all classes may be asked as to an hypothetical case. But if the facts on which the hypothesis is based fall, the answer falls also ; nor can an expert be asked as to an hypothesis having no foundation in the evidence in the case, or resting upon statements made to him by persons out of court."

In Wharton & Stille's Medical Jurisprudence (volume 2, p't 2, § 1243) we find it said that "experts may be asked their opinion as to the scientific bearing of a particular fact and as to an hypothetical case, but not as to inferences to be drawn from the whole trial, for this would be to invade the province of the jury ; nor as to conclusions of law, for this would be to invade the province of the court."

In the case of *McMechen* v. *McMechen*, 17 W. Va. 683, this Court states the law in regard to the testimony of medical experts as follows : "When a medical expert is asked to give his professional opinion to a jury, not upon matters within his own knowledge, but upon an hypothetical case, founded upon the testimony of witnesses previously examined in the case, the questions to him must be so shaped as

to give him no occasion to mentally draw his conclusions from the whole evidence, or a part thereof, and from those conclusions so drawn express his opinion, or to decide as to the weight of evidence or the credibility of witnesses ; and his answers must be such as not to involve any such conclusion so drawn, or any opinion of the expert as to the weight of the evidence or the credibility of the witness."

In section 8 of the syllabus of that case it was held that "the opinion of medical experts founded on testimony already in the case can only be given on an hypothetical case, and the hypothesis must be clearly stated, so that the jury may know with certainty upon precisely what state of assumed facts the expert bases his opinion."

Now, the object in examining an expert as a witness is to obtain from him his opinion upon a supposed state of facts which the evidence in the cause must have a tendency to prove, in regard to which, on account of his learning and experience, he is peculiarly fitted to speak and give his opinion. A man, for instance, who has had charge of an insane hospital for years, and made his home among that unfortunate class of humanity, is better prepared to give a correct opinion or draw a proper conclusion from a given state of facts than one who has rarely been thrown in company with an insane person ; and so when an affliction like paralysis ensues from an accident or disease, and a question is raised as to the proximate cause, and different theories are presented, based upon a different state of facts brought forward by the respective litigants upon the trial of an issue, and either party may propound a question based upon his theory of the evidence, as we have seen in the case of *Cowley* v. *People, supra,* "it is not necessary that an hypothetical question should state the facts as they exist, for the reason that in a trial where there is a dispute as to the facts which can only be determined by a jury there would be no room for an hypothetical question. The very meaning of the word is that it supposes something for the time being. Each side in an issue of fact has its theory of what is the true state of facts, and assumes that it can prove it to be so to the satisfaction of the jury, and, so assuming, shapes hypothetical questions to experts accordingly, and such is

87

the correct practice." The hypothesis, as we have seen in *McMechen* v. *McMechen*, *supra*, must be stated clearly, so that the jury may know with certainty upon precisely what state of assumed facts the expert bases his opinion."

Wharton, on the Law of Evidence (volume 1, § 452) says: "The better opinion is that an expert can not be asked his opinion as to the weight of the evidence in the case as rendered, not only because this puts the expert in the place of the jury in determining as to the credibility of the facts in evidence, but because the relief thus afforded is in most trials only illusory, experts being usually in conflict, and the duty devolving on court and jury of supervising such conclusions of experts being one which can be rarely escaped. It has been said, however, that, when the facts are undisputed, the opinion of an expert can be asked as to the conclusions to be drawn from them, and it is now settled that experts of all classes may be asked as to a probable hypothetical case."

It will be noticed that the facts recited in the question propounded to Dr. Dabney are undisputed, and the theory of the plaintiff was that the facts therein detailed indicated that the step over the offset in the pavement induced the plaintiff's paralytical condition. The question propounded to Dr. Dabney was objected to on the ground that it does not correctly detail the evidence either as to the accident or the disease. It has, however been held that an expert may be examined hypothetically on a particular piece of evidence or parts of the testimony.

In the case of *Gilman* v. *Town of Strafford*, 50 Vt. 723, a case which presents a striking similarity to the one under consideration, "the injury in question was alleged to have been caused by a log in the highway, against which the plaintiff drove in the dark, by means whereof he was thrown from his sleigh upon his hip or back, and so hurt as to cause partial paralysis." One ground of defence was that if the plaintiff had paralysis it was induced by causes operative previous to the alleged accident; as an abscess on his hip; the erysipelas, *etc.* The court held as follows: "In case for personal injury on a highway, medical experts, who had read a deposition that plaintiff had given in the

cause, and which was afterwards used on trial, wherein he related the circumstances of the injury, and minutely detailed the injuries and bodily condition claimed to have resulted therefrom, were asked what, 'from the knowledge gained by reading the deposition,' their opinion was as to the plaintiff's condition at the time he gave his deposition, and as to the cause of that condition." Held proper.

In this case the witness evidently had neither read nor heard all of the testimony which was used upon the trial. The circumstances, however, of the injury were detailed to him from the plaintiff's standpoint, and he was asked from the knowledge gained from reading the deposition what his opinion was as to the plaintiff's condition. Dr. Dabney was asked by plaintiff's counsel, after he had detailed the circumstances as he considered them proven with regard to the accident and the apparent effect of the same upon the plaintiff, "taking all these things to be true, what would you say was the proximate cause of this effect?" which question was objected to. The objection was overruled, and he answered, "Taking that as a basis, it would be highly probable that the fall had something to do with it." From what has been said in connection with the authorities quoted I think the question was a proper one, and the objection was properly overruled.

It appears from bill of exceptions No. 2 that Dr. A. B. McGinnis was asked by the plaintiff the following question: "Doctor, from your former knowledge of Dyke Bowen, from your observation of him while practicing in his family prior to 1888, and your practice on him since that time, would you say his present troubles were caused by syphilis?"—which question was objected to, the objection overruled, and the question was permitted to be asked, and the witness answered, "I would not." Was this ruling of the Circuit Court proper?

Wharton on the Law of Evidence (volume 1, § 440) says: "We will hereafter notice that witnesses are ordinarily not allowed to give opinions as to conclusions dependent upon facts which are not necessarily involved in such conclusions. An exception to this rule is recognized in the case of experts, who are entitled to give their opinions or judg-

ments as to conclusions from facts within the range of their specialties, but too recondite to be properly comprehended and weighed by ordinary reasoners. It makes no difference as to what is the specialty with which the expert is conversant. If its laws are not familiar to the ordinary business man, they must be proved, and their application to the case in issue shown by an expert." And in section 441: "The most common illustration of the principle just stated is that of a physician or surgeon. * * * So jurisprudence does not say to a physician or surgeon called to testify whether a wound or a poison was fatal, 'You must have a particular diploma, or belong to a particular professional school,' but it says, 'If you have become familiar with such laws of your profession as bear upon this issue, then you can testify how the issue is affected by such laws.' Hence physicians, generally are admissible to state the nature and effects of a disease." If such be the case, it follows as a matter of course that physicians are more competent to speak of the nature and effect of a disease which falls under their immediate observation, and is subjected to their professional treatment. The witness was asked to base his opinion upon his former knowledge of the plaintiff, from his observation while practicing in his family prior to 1888, and his practice upon him since that time, as to whether his present troubles were caused by syphilis, and answered, "I would not." This would seem to be the best evidence the nature of the case would admit of, and I should regard it as strictly proper that the witness should express his opinion in regard to a matter falling within his specialty, and as to information derived as to plaintiff's condition during the time he was practicing in his family and treating him professionally.

The question asked Dr. A. B. McGinnis, as set forth in the bill of exceptions No. 3, was also objected to by the defendant, and the objection overruled. In that question, which was in an hypothetical form, the witness was asked from his knowledge of Dyke Bowen: "Suppose it to be true that he was a sound and healthy man, and was walking along, in the night-time, on the side walk in the streets

of the city of Huntington, and suddenly and unexpeetedly stepped over a sudden declivity of anywhere from eight to fourtcen inches," and then continuing, describing the accident and said Bowen's conduct, and the manner in which he was subsequently affected, as in the former question, and concludes as follows: "Taking all these things into consideration, and supposing them to be true, would you say that that sudden step over there would be more likely to produce his present condition than syphilis in its tertiary form?"

This witness had just stated that, from his former knowledge of plaintiff, from observing him while practicing in his family prior to 1888, and from treating him since that time, he would say his present troubles were not caused by syphilis, so that when the hypothetical question contained in bill of exceptions No. 3 was propounded to him, and he was asked whether, taking all that had been recited to be true, he would say that sudden step over there would be more likely to produce his present condition than syphilis in its tertiary form, it was equivalent to asking him if the sudden step over there did not produce his present condition; and although the question calls for a comparison between the two supposed causes, yet, he having already answered that the present troubles of plaintiff were not caused by syphilis, the defendant would not be prejudiced thereby, and it may be classed as a harmless error.

The hypothetical question contained in bill of exceptions No. 4, propounded to Dr. Davis, is the same in substance as the one propunded to Dr. McGinnis, with the exception that it recites the symptoms of syphilis spoken of by Dr. Beardsley as noticed in 1872, and treated by him; also the symptoms of the same dieaso discovcred and treated by Dr. Dabney in 1887, and like symptoms of the same disease discovered and treated by Dr. Holstein in 1889; and he is asked to state, taking all these things to be true, what he would say was the immediate or proximate cause of the injury, the sudden stepping over the offset, or said disease the doctors profess to have discovered in him? which question being objected to, and having been overruled by the court, the witness answered, "Stepping over the pre-

cipice." The question propounded to this witness was an hypothetical one, and its solution required medical knowledge and experience. The question was not such a one as the ordinary layman not versed in medical science could answer, and we find it laid down in Wharton's Law of Evidence (volume 1, § 437) that "where conclusions depend upon facts whose evidential weight can only be determined by those familiar with a particular specialty, then these conclusions may be given by experts in such specialty." I, therefore, think the question propounded was proper, and the court committed no error in overruling the objection to the same.

The questions propounded to Dr. Hallahan and Dr. Gardner, as set out in exceptions Nos. 5 and 6, may be considered together, as the same objection seems to be urged to each of them in the brief filed by the plaintiff in error, to wit, that Dr. Hallahan was asked whether he had heard the testimony of Drs. Dabney, Beardsley, and Holstein, and, after answering in the affirmative, he was asked an hypothetical question, based upon the testimony so heard by him, and a detailed statement of other evidence ; and after Dr. Gardner had stated that he had heard the hypothetical question which had been put to Dr. Hallahan, set out in bill of exceptions No. 5, the plaintiff, by his attorney, asked said witness to give his opinion upon the facts therein stated, both of which questions were objected to, and the objection overruled. Upon the question raised by these objections we find that in the case of *Livingston* v. *Com.*, 14 Gratt. 592, it was held that upon a trial for homicide it is competent for the commonwealth to introduce physicians or surgeons to give their opinion, on a state of facts testified to by themselves or other witnesses in respect to a wound or beating proved to have been inflicted on the deceased, as to whether such wound or beating would be a cause adequate to produce the death, or was the actual cause of the death. In the case of *Hunt* v. *Gas-Light Co.*, 8 Allen 169, which was an action of tort against a gaslight company for an injury to the plaintiff's health from an inhalation of gas which escaped from the defendant's pipes, the plaintiffs called three physicians, who had heard

the testimony on the part of the plaintiffs, which was not conflicting, and asked each of them this question : "Having heard the evidence, and assuming the statements made by the plaintiffs to be true, what, in your opinion, was their sickness, and do you see any adequate cause for the same ?" The defendants objected, but the objection was overruled, and the court, in its opinion, held that "in the present case the question allowed to be put does not seem to us to require of the witness anything more than a scientific opinion ; " and under these rulings I think the Circuit Court committed no error in allowing said questions to be asked and answered.

The defendant also assigns as error that the court rejected instruction No. 1, asked for by it and set forth in bill of exceptions No. 7. In that instruction the defendant sought to have the jury told that during the progress of the improvement of a sidewalk the absolute liability imposed on it by section 53 of chapter 43 of the Code is suspended, and that if they find from the evidence that the sidewalk therein described was being improved at the time and place of the injury complained of by an abutting landowner, at the command of the city, and that such injury was caused by the condition in which the work on such improvement had placed said sidewalk, they must find for the defendant, unless they further found that the work of improvement was negligently conducted by the lot-owner ; that such negligence was either known to the city, or by due diligence might have been known ; and that it was the proximate cause of the injury. The objection to this instruction is that there is no evidence tending to prove that the improvement of this sidewalk was negligently conducted by Sanborn, the lot-owner. No negligence appears to be imputed to him while making the improvement, but the complaint was that the excavation made by him left a bluff bank on the adjoining lot at the end of his pavement, and it was the condition in which this bank was left, and not his negligence in laying the pavement, that the plaintiff charges caused the injury, which, I think, is properly presented and stated in the modified instruction given by the court, and in my opinion the court committed no error

in the rejection of said instruction. Said instruction No. 1 and modified instruction No. 1 as given by the court, read as follows:

Defendant's Instruction No. 1: "The court instructs the jury that the defendant has a right to improve its sidewalks, which improvement may be made by the city itself or by the abutting lot-owner at the command of the city, and that during the progress of such improvement the absolute liability imposed on it by section 53 of chapter 43 of the Code is suspended, and they are instructed that if they find from the evidence in this case that the sidewalk on the south side of Third avenue, between Twelfth and Thirteenth streets, was being improved at the time and place of the injury complained of by an abutting lot-owner at the command of the city, and that such injury was caused by the condition in which the work on such improvement had placed said sidewalk, they must find for the defendant, unless they further find that the work of improvement was negligently conducted by the lot-owner; that such negligence was either known to the city, or by due diligence might have been known; and that it was the proximate cause of the injury."

To the giving of said instruction the plaintiff, by his counsel, objected, which objection was sustained, and the said instruction refused as prayed, but was modified and given by the court in the following form:

Defendant's Instruction No. 1, Modified: "The court instructs the jury that the defendant has a right to improve its sidewalks, which improvement may be made by the city itself or by the abutting lot-owner at the command of the city, and that during the progress of such improvement the absolute liability imposed on it by section 53 of chapter 43 of the Code is suspended; and they are instructed that if they find from the evidence in this case that the sidewalk on the south side of Third avenue, between Twelfth and Thirteenth streets, was being improved at the time and place of the injury complained of by an abutting lot-owner, at the command of the city, and that such injury was caused by the condition in which the work on such improvement had placed said sidewalk, they must find for the defendant,

unless they further find that the work of improvement was negligently conducted by the lot-owner, and that such injury was caused by the negligent condition in which such sidewalk was left by the lot-owner in such work of improvement, and without any fault on the part of the plaintiff."

The instructions, 1, 2, 3, 4, and 5, which were asked for by the plaintiff, and which were all objected to by the defendant's counsel, seem to me to propound the law correctly, and in my opinion were properly given to the jury. They read as follows:

Plaintiff's Instruction No. 1: "The court instructs the jury that when a city is incorporated, and is given control over the streets and sidewalks within its corporate limits, and is empowered to provide the means to make and repair them, the corporation not only assumes this duty, but by implication agrees to perform it for the benefit and protection of all who may have occasion to use them, and that for failure in the discharge of this duty the municipal corporation is responsible to the party injured thereby."

Plaintiff's Instruction No. 2: "The jury are further instructed that the plaintiff need only allege and prove the existence of the defect or want of repair in the sidewalk in the declaration mentioned, and that he was injured thereby without any fault of his own, and that the sidewalk at the place where plaintiff's injury is alleged to have occurred was under the control of the defendant within its corporate limits, and was by the defendant treated and assumed to be kept in repair as a public sidewalk."

Plaintiff's Instruction No. 3: "The jury are further instructed that while the defendant, for the purpose of grading the sidewalk in the declaration mentioned, might have temporarily obstructed the passage of travel over the same, it was not authorized to leave such street while undergoing such grading in such condition as unnecessarily to expose those who might pass upon it to danger, and that in such condition such sidewalk should not have been left without protection or guard or beacon, especially at night, to warn travelers against such danger, and that if such reasonable precautionary measures were not adopted for

the safety of the citizens and travelers the defendant was culpable, and liable for injuries, if any, to the plaintiff, without any fault on his part, just as if the defendant had permitted one of its graded streets to become unsafe for want of repairs."

Plaintiff's Instruction No. 4: "The court further instructs the jury that if they believe from the evidence in this case that the plaintiff was afflicted with a disease which existed at the time of the alleged injury, which disease was aggravated by such injury, that the plaintiff, on satisfactory proof of the existence of the defect in the sidewalk in the declaration mentioned, and that he was injured thereby, is entitled to full compensatory damages."

Plaintiff's Instruction No. 5: "The jury are further instructed that if they believe from the evidence that the plaintiff was injured as charged in his declaration, then the rule for the measurement of damages is substantially that the plaintiff's damages must be measured by the loss of time during the cure of such injury or injuries, and the expenses incurred in respect thereto, the pain and suffering undergone by the plaintiff, and any permanent injury, especially when it causes a disability for further exertion, in whole or in part, and consequent pecuniary loss."

For these reasons our conclusion is that the judgment complained of must be affirmed, with costs and damages to the appellee.

AFFIRMED.